USDC SDNY
DOCUMENT ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 5 - 2 6 - 16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

NICOLE GERMAINE WILLIAMS, :

         **Plaintiff,** :

         **-against-** :

CAROLYN COLVIN, Acting Commissioner :
of Social Security,

         **Defendant.** :

------------------------------------------------------- x

    **15-cv-4173 (ALC)**

    <u>**OPINION AND ORDER**</u>

**ANDREW L. CARTER, JR., United States District Judge:**

    The plaintiff, Nicole Germaine Williams, brings this action to reverse a final decision of

the defendant, the Commissioner of Social Security (the "Commissioner"), that Williams was not

entitled to Supplemental Security Income ("SSI") benefits. The parties have filed cross-motions

for judgment on the pleadings pursuant to Fed. R. Civ. P. Rule 12(c). Because the administrative

law judge ("ALJ") at Williams's hearing found that there were significant nonexertional

limitations on Williams's ability to work but declined to employ a vocational expert, Williams's

motion is granted and the case is remanded for a rehearing.

## BACKGROUND

### I.    Procedural Background

    Williams filed an application for SSI benefits on October 30, 2013, alleging that her

disability began on August 7, 2013. (A.R. 99-101.)[1] Her application was initially denied on

February 27, 2014. (A.R. 112-13.) She filed a written request for a hearing, and after a hearing

held on June 11, 2014, an ALJ denied Williams's application on July 22, 2014, finding that she

was not disabled. (A.R. 33-36.) Williams requested review of the ALJ's decision by the Appeals

---

[1] "A.R." refers to the administrative record prepared by the Social Security Administration (ECF No. 10).

Council. (A.R. 1.) On March 30, 2015, the Appeals Council denied her request for review and the ALJ's decision became the final decision of the Commissioner of Social Security. (A.R. 1.) Williams filed this civil action on June 1, 2015, and moved for judgment on the pleadings on December 15, 2015. (ECF Nos. 1, 12.) The Commissioner cross-moved for judgment on the pleadings on January 11, 2016. (ECF No. 14.)

## II.    Factual Background

Williams was born on November 3, 1968, and she was 44 years old at the time she applied for SSI benefits. (A.R. 161.) She completed school through the ninth grade. (A.R. 182.) At the time of her hearing, she lived in the Bronx with her child, who was born in 1998. (A.R. 162.) She previously worked on an assembly line and as a hair dresser. (A.R. 182.)

### A.    Evidence Regarding Williams's Physical Health

#### 1.    Medical History

Williams was treated by Dr. Dean Newton at the South Jersey Primary Care Physicians and Rehabilitation Center on July 17, 2010. (A.R. 249.) She reported that she was hit by a car on the left side of her body on September 14, 2009. (A.R. 249.) She reported that since then, she experienced tenderness in her neck, upper back, and lower back, as well as pain in her left shoulder and left hip, extending into her lower leg. (A.R. 249.) She reported that she had undergone physical therapy, neuro-modulation therapy, and chiropractic care. (A.R. 249.) Dr. Newton found point tenderness in Williams's spine, limited cervical and lumbar motion, spasms and multiple trigger points, and reduced strength and range of motion in the left shoulder. (A.R. 248.) He also noted that a cervical MRI showed a bulging disk and paracentral herniation, as well as encroachment upon a nerve root. (A.R. 248.) He concluded that the September 2009 car accident resulted in "significant injuries," that Williams's symptoms would be exacerbated by

lifting, overhead activities, prolonged ambulation, and prolonged squatting, and that her "condition has become permanent and stationary," i.e. that further physical therapy and chiropractic treatment would not help. (A.R. 247-48.)

On July 10, 2013, Williams went to the emergency room at Bronx-Lebanon Hospital and reported that she had run out of insulin for her diabetes. (A.R. 287.) She also complained of chronic back pain, lower extremity numbness, and high blood sugar. (A.R. 320.) The records reflect chronic conditions of Type II diabetes mellitus, anemia, and hypertension. (A.R. 320.) At the visit, Williams's prescribed dose of Lantus, an insulin pen, was increased. (A.R. 320.)

On December 11, 2013, Williams saw podiatrist Nicole Marie Castillo, and reported that since the car accident, she had a painful left heel when ambulating. (A.R. 343.)  On examination, her posterior left heel was tender, and she was diagnosed with a possible posterior heel spur. (A.R. 344.) She returned to Dr. Castillofor a second examination and indicated there was numbness to the plantar aspect of her foot. (A.R. 346.) An X-Ray revealed a posterior heel spur. (346.) Dr. Castillo diagnosed diabetes mellitus with neuropathy and posterior heel spur with insertional Achilles tendinopathy. Williams was given instruction on diabetic foot care and was prescribed a gel, diabetic shoes, and physical therapy. (A.R. 347.)

On January 10, 2014, Williams saw physical therapist Olatunji Gbotosho, for treatment of lumbago, causalgia of upper and lower limbs, and cervicalgia. (A.R. 461.) She reported severe low back pain and associated lower leg symptoms such as numbness and tingling. (A.R. 461.) She reported that her pain interfered with her sleep, that it was exacerbated by standing and walking, and that she had moderate difficulty with activities of daily living. (A.R. 461.) Gbotosho noted that Williams was "[a]mbulatory with assistive device using cane with limping gait" and that she listed to the right while walking. (A.R. 461.) Gbotosho observed that Williams

had decreased muscular performance and stability of the trunk, muscle spasms, and muscle

guarding. (A.R. 461.) Williams continued physical therapy through June 2014. (A.R. 460-478.)

### 2.   Physician's Assistant Gerry LaQuinte

On January 10, 2014, Williams saw Physician's Assistant Garry LaQuinte, of Tremont

Quality Medical Care, and reported left shoulder pain, lower back pain, and numbness in her legs

and feet. (A.R. 479.) He diagnosed her with: lumbago, shoulder pain, anxiety disorder, tobacco

use disorder, other idiopathic peripheral autonomic neuropathy, bipolar disorder, and headache.

(A.R. 479.) He found her to have a full range of motion in her left shoulder and extremities and

normal curvature of the spine. (A.R. 479.) He prescribed Percocet. (A.R. 479.) Williams saw

LaQuinte again on February 14, 2014, February 18, 2014, April 23, 2014, May 27, 2014, May

29, 2014, and June 6, 2014. (A.R. 480-91.) Her complaints and diagnoses remained similar

throughout, though on April 23, 2014, he declined to refill her Percocet (A.R. 481), and on June

6, 2014, he modified her diagnoses to: benign essential hypertension, bipolar disorder, diabetes

mellitus, anemia, herpes simplex, other and unspecified hyperlipidemia, and ankle joint pain.

(A.R. 490.) He prescribed medications for diabetes mellitus, as well as pain medications and an

ankle brace. (A.R. 490.)

On May 27, 2014, LaQuinte completed a medical source statement. (A.R. 453.) He

indicated that Williams could sit for two to four hours and stand and/or walk for three hours in an

eight-hour workday with normal breaks, and that she must alternate between sitting and standing

every 60 minutes. (A.R. 453.) He also indicated that she could occasionally lift less than 10

pounds and could rarely lift up to 50 pounds or more, and that she could occasionally push and

pull with all extremities, reach in all directions, handle, finger, and feel. (A.R. 453.) He noted

that Williams's symptoms would occasionally interfere with her ability to focus and concentrate

and that she would miss three workdays or more per month. (A.R. 454.) In a section titled
"Accommodations," he marked that she would need unscheduled hour-long breaks every 30
minutes. (A.R. 454.) He identified "low back pain with moderate full range of motion" as the
objective finding supporting his conclusion. (A.R. 454.)

### 3.    Consultative Examiner Dr. Marilee Mescon

On February 18, 2014, Williams saw Marilee Mescon, M.D. for a consultative
examination. (A.R. 361.) Williams reported that she had pain in her left foot, back pain, high
blood pressure, and diabetes. (A.R. 461.) She described the pain in her left foot as a burning
feeling in her heel, and she described her back pain as "10/10" unmedicated, and "0/10" as soon
as she takes analgesic medications." (A.R. 361.) Williams also reported that she has been
diabetic since 2005, and as a result, is always thirsty and hungry, but had not ever been
hospitalized for uncontrolled diabetes. (A.R. 362.) Finally, Williams reported that she smoked an
unknown amount of cigarettes, but she denied drinking alcohol or using cocaine, marijuana, or
heroin. (A.R. 362.)

Williams told Dr. Mescon that she could cook, clean, do the laundry, shop, shower,
bathe, and dress, and that she spent her time watching television and performing household
chores. (A.R. 363.) She reported using a back brace and said that her pain did not change when
she stood or bent forward. (A.R. 361.) She also reported that she could stand and walk for an
hour. (A.R. 361.) Dr. Mescon noted that Williams did not appear to be in acute distress, and that
she could walk on her heels and toes without difficulty. (A.R. 363.) She could only squat a
quarter of the way down, and she wore a brace around her left ankle and her back. (A.R. 363.)
Williams did not need help changing for the exam or getting on and off the exam table, and she
was able to rise from the chair without difficulty. (A.R. 363.)

Dr. Mescon noted diminished sensory perception over Williams's right food and left thigh, and diagnosed her with high blood pressure, history of anemia, back pain, left foot pain, and diabetes with diabetic retinopathy. (A.R. 364-65.) She concluded, "[T]here are no limitations in the claimant's ability to sit or to stand, but her capacity to climb, push, pull, or carry heavy objects will be moderately to severely limited because of the claimant's back pain and pain in the left heel." (A.R. 365.)

### B.    Evidence Regarding Williams's Mental Health

#### 1.    Mental Health History

On April 6, 2011, Williams was discharged from the Bronx-Lebanon Comprehensive Psychiatric Emergency Program; she had been admitted after she reported feeling depressed and attempted suicide by swallowing pills. (A.R. 270.) She reported that she had been high on crack cocaine for the previous five days and had taken Ambien to try to sleep. (A.R. 270.) Williams was diagnosed with bipolar disorder, and was discharged to an outpatient facility. (A.R. 272-73.)

#### 2.    Dr. Kingsley Nwokeji

Between August 24, 2012, and May 9, 2014, Williams was treated by Dr. Kingsley Nwokeji for mental health issues including depression, mood swings, and hearing voices and seeing shadows. (A.R. 377-452.) He continually diagnosed her with bipolar affective disorder, cocaine abuse, diabetes mellitus, and hypertension, and she was prescribed at various points Wellbutrin, Seroquel, Ambien, Abilify, Zoloft, Xanax, Geodon, and Klonopin.(A.R. 377-452.) Over the course of his treatment of Williams, Dr. Nwojeki noted that her mood was depressed and that she suffered from mood swings, but he also reported that Williams denied any suicidal ideation and did not exhibit signs of psychosis or mania. (A.R. 377-452.) He observed that her appearance was appropriate, that she had fair reasoning, insight, and judgment, had realistic self-

perception, average intelligence, and an intact memory, and that she cooperated. (*See, e.g.* A.R. 377-78, 394-95, 402-03.) He continuously opined that her Global Assessment of Function score ("GAF") was 52. (*See, e.g.* A.R. 377-78, 394-95, 402-03.)

Dr. Nwokeji submitted a mental residual functional capacity analysis, dated June 10, 2014. (A.R. 455.) He reported that he had seen Williams monthly for the last two years, and that she had diagnoses of bipolar disorder, poor social support, and hypertension, and that she suffered from persistent depressive mood, mood swings, common auditory hallucinations, and labile affect. (A.R. 455.) He also noted symptoms including: anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, thoughts of suicide, blunt, flat, or inappropriate affect, feelings of guilt or worthlessness, mood disturbance, difficulty thinking or concentrating, paranoid thinking or inappropriate suspiciousness, decreased need for sleep, and involvement in activities that have a high probability of painful consequences which are not recognized. (A.R. 456.) He wrote that her current GAF was 40 and her highest GAF in the past year was 50. (A.R. 455.) He found that she would be seriously limited but not precluded from a number of the abilities and aptitudes needed to do unskilled work, and unable to meet competitive standards in terms of remembering work-like procedures, understanding and remembering very short and simple instructions, understanding, remembering, and carrying out detailed instructions, setting realistic goals or making plans independently of others, and dealing with the stress of semiskilled and skilled work. (A.R. 457-58.) Finally, he noted that he anticipated Williams would miss about three days of work per month and that her impairment lasted or could be expected to last 12 months or more. (A.R. 459.)

Dr. Nwokeji submitted an additional treating physician's wellness plan report, dated August 8, 2013. (A.R. 299-300). He reported that he had been treating Williams for depression and bipolar disorder for two years, that she took Zoloft and Xanax, and that her condition had not stabilized, and he checked a box indicating that she was, "Unable to work for at least 12 months." (A.R. 299-300.)

### C.       Consultative Examiner Dr. Arlene Broska

On February 18, 2014, Williams saw psychologist Arlene Broska for a psychiatric consultative examination. (A.R. 367.) Williams reported a history of three suicide attempts, the last occurring six years prior, as well as anxiety and a lack of patience. (A.R. 367-68.) She reported she was hospitalized for two days the year prior and that she had been receiving treatment for bipolar disorder for the last three years. (A.R. 367.) She reported difficulty sleeping, that she was always sad, that she cried for no reason, had no clothes, preferred to stay home, did not want to shower, and wanted to stay in bed. (A.R. 368.) While she did not report current symptoms of thought disorder or mania, she reported that she had dreams about deceased people and that after her mother died, she thought she saw someone standing in a doorway when no one was there. (A.R. 368.) She also reported she does not like to take public transit because it triggers anxiety. (A.R. 368.)

Dr. Broska found Williams to be uncooperative with mental status testing but adequate in her manner of relating, social skills, and overall presentation. (A.R. 368.) Her appearance was appropriate and her speech was fluent and clear, she showed coherent and goal-directed thought processes, and appropriate affect, and she appeared to have average cognitive functioning and have an appropriate general fund of experience. (A.R. 369.) Dr. Broska noted that Williams was able to dress, bathe, and groom herself, cooked five times a week, cleaned, did laundry, and

shopped once a month, watched TV, went to doctor appointments, traveled independently on

public transportation, and had associates with whom she interacted. (A.R. 369.) Dr. Broska

concluded:

> Vocationally there is no evidence of limitations in the claimant's ability to follow and
> understand simple directions and instructions, perform simple or complex tasks
> independently, maintain attention and concentration, learn new tasks, or maintain a
> regular schedule. There is evidence for moderate limitation in her ability to appropriately
> deal with stress. There is mild to moderate limitation in her ability to relate adequately
> with others.

> The results of the examination appear to be consistent with psychiatric problems, but in
> itself does not appear to be significant enough to interfere with the claimant's ability to
> function on a daily basis.

(A.R. 370.)

### D.   Testimonial Evidence

### 1.   Function Reports

Norma Tejada, an "entitlement specialist" at Federation Employment and Guidance

Service, completed a third-party function report in which she reported Williams's responses to

various questions. (A.R. 189-96.) The report indicated that Tejada had no previous relationship

with Williams. (A.R. 189.)

Michael Nazario, Williams's "case manager," completed an adult function report on

December 20, 2013. (A.R. 201.) He reported that she needed help with laundry and chores and

did not drive or go out alone, that she could not pay bills but could count change and handle a

savings account, and that she spent her time watching television and talking to friends on the

phone. (A.R. 204-06.) He also reported that she could walk for five blocks before needing to rest

for ten minutes, could follow spoken but not written instructions, and had difficulty getting along

with authority figures. (A.R. 208.) Finally, he reported that Williams needed assistance putting

on some of her clothes and needed reminders to take medication, but that she was able to cook

meals for her son on a weekly basis. (A.R. 202.)

### 2.   Williams's Testimony

Williams testified at her June 11, 2014, hearing. (A.R. 60.) She testified that she lived

alone with her 16-year-old son and that she had previously been self-employed as a hair stylist.

(A.R. 60-65.) She said that she stopped styling hair because she could not stand or sit long

enough and required too many breaks. (A.R. 65.)

She testified that she had been hit by a car in New Jersey, causing herniated disks and

orthopedic problems including tendinitis, and that as a result she had to wear a back brace and

could not sit for too long. (A.R. 65-68.) She testified that she could only lift a gallon of milk with

both hands, that she could only sit in a chair for half an hour, and that she could only stand for

five minutes before having to sit back down. (A.R. 83-84.) She said that she could only walk

three city blocks before needing to stop and rest, and that she rarely did household chores

because she could not stand for very long. (A.R. 85.) She also testified that her son had to help

her cook because she would otherwise forget to turn the pot off, and that she needed her son's

help to buckle her shoes, as she could not bend on one knee. (A.R. 87.)

Williams testified that she received monthly psychiatric treatment from Dr. Kingsley.

(A.R. 66.) She testified she had been told that she was paranoid, that she heard noises and voices,

that she was a "loner" who had associates rather than friends, and that people were nervous

around her. (A.R. 66-67.) She said that she took Klonopin because she heard voices at night.

(A.R. 71.) She also reported taking two other psychiatric medications. (A.R. 71.) She stated that

she previously used crack cocaine but had last done so two years prior. (A.R. 71.) She testified

that she was unable to understand what she read and that she could not follow movies. (A.R. 73.)

She also testified that she did not get along with other people and rarely went to the supermarket because there were too many other people, that she did not like getting on the subway because it was too crowded and voices told her to "fight" and do "stupid things" while on the train, and that the voices made her feel anxious and have panic attacks. (A.R. 75-82.) She testified that she slept all day because of her depression, no longer had ambition, and only showered when her son told her she "stinks." (A.R. 80-82.)

## DISCUSSION

## I.    Legal Principles

### A.    Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). It is "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012). "The Court, however, will not defer to the Commissioner's determination if it is the product of legal error." *DiPalma v. Colvin*, 951 F. Supp. 2d 555, 566 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

### B.    Determination of Disability

To establish a disability under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability at issue must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

"The Commissioner of Social Security has promulgated regulations that set forth a five-step sequential evaluation process to guide disability determinations." *Cichocki v. Astrue*, 729 F.3d 172, 174 n. 1 (2d Cir. 2013) (internal citation omitted). The Second Circuit has described this process as follows:

> [1.] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2.] If he is not, the Commissioner next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities.
>
> [3.] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled
>
> [4.] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity[2] to perform his past work.
>
> [5.] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

---

[2] "The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by his impairments. In assessing the residual functional capacity of a claimant with multiple impairments, the SSA considers all his medically determinable impairments including medically determinable impairments that are not severe." *Selian*, 708 F.3d at 418 (citing 20 C.F.R. § 404.1545) (internal citations, quotation marks, and alterations omitted).

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (alterations omitted) (footnote added).

"The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." *Id.* (citations omitted). "In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids)." *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *amended in part on other grounds on reh'g*, 416 F.3d 101 (2d Cir. 2005) (quoting *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)).

### C.     The ALJ's Decision

In his decision, the ALJ evaluated Williams's claims for SSI benefits pursuant to the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920. (A.R. 33-50.) First, the ALJ found that Williams had not engaged in substantial gainful activity since October 30, 2013, the application date. (A.R. 38.) Second, the ALJ found that Williams had the following severe impairments: Diabetes Mellitus with a Secondary Foot Impairment, Hypertension, Degenerative Disk Disease, Thyroiditis, Peritrochanteric Bursitis, Chronic Anemia, Dyslipidemia, Substance Abuse Disorder (Cocaine), Bipolar Disorder, and Major Depressive Disorder. (A.R. 38.) Third, the ALJ determined that Williams's impairments or combination of impairments did not meet or medically equal any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (A.R. 39.) Fourth, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant is limited to simple, routine and repetitive tasks performed in a low stress environment, defined as involving only occasional interaction with others.

(A.R. 41.)

In determining Williams's RFC, the ALJ found that Williams was not "fully credible." (A.R. 48.) He noted that Williams claimed in her testimony that she could only lift a gallon of milk with both hands, sit for half an hour, stand for five minutes, and walk three city blocks before experiencing pain, that she lost balance in her left leg and had fallen twice, and that she claimed in her adult functioning report that a herniated disk in her back prevented her from lifting and standing and limited her walking to one hour. (A.R. 48.) However, the ALJ noted that the medical record showed Williams could still perform the activities of daily living, including cooking, cleaning, doing laundry, shopping, showering, bathing, dressing, and doing household chores, and that she traveled independently on public transit and went to appointments. (A.R. 48.) He also found that Williams's statements about her drug history were not credible, as she testified that she stopped using cocaine two years prior to the hearing, but her medical records reflected a continuous diagnosis of cocaine abuse, and a urine toxicology report dated one year prior the hearing was positive for cocaine. (A.R. 49.)

As to Williams's physical limitations, the ALJ accorded "some weight" to the opinion of Dr. Mescon, the consultative examiner, as Dr. Mescon "is not a treating source and does not have a history of treating the claimant," and he disagreed with Dr. Mescon's finding that Williams does not have limitations in sitting or standing and does not have back problems. (A.R. 44.)

The ALJ also accorded "some weight" to the opinion of "Dr. LaQuinte," as "Dr. LaQuinte is a treating source who has seen the claimant on more than one occasion." (A.R. 44.) The ALJ noted that LaQuinte's opinion of the claimant's exertional limitations were consistent with his notes and the record, but "there is nothing in the record or his notes to support his contentions that the claimant would need to miss more than three days of work a month due to her conditions," and "there is nothing in the record or in his notes to demonstrate that the

14

claimant would need the accommodations that he prescribed, or that the claimant has manipulative limitations." (A.R. 44.)

As to Williams's mental health limitations, the ALJ accorded "little weight" to the opinion of Dr. Nwojeki, explaining that while "Dr. Nwojeki had a long history of treating the claimant and saw her on multiple occasions, Dr. Nwojeki's functional assessments are inconsistent with his medical treatment notes." (A.R. 45-46.) The ALJ gave "some weight" to the opinion of Dr. Broska, the psychological consultative examiner, explaining that she "based her opinion on a single examination and [did] not adequately account for claimant's subjective allegations and documented history of symptomology." (A.R. 47.) The ALJ also gave "some weight" to the opinion of Dr. Kamin, a state psychiatric medical consultant, as he was "not a treating source and has never personally examined the claimant." (A.R. 47.) Finally, the ALJ accorded "little weight" to the opinion of Norma Tejada, the entitlement specialist who completed a third party adult functioning report, as she had no relationship to the claimant. (A.R. 47-48.)

After determining Plaintiff's RFC, the ALJ found that Williams has no past relevant work, as her listed positions either did not meet the SSA's durational requirements for "past relevant work" or did not meet the SSA's earnings requirements for "substantial gainful activity." (A.R. 49.)

Finally, at Step Five, the ALJ determined that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Williams can perform. (A.R. 50.) The ALJ found:

> If the claimant had the residual functional capacity to perform the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of 'not disabled' would be directed by Medical Vocational Rule 201.18. However, the additional limitations have little or no effect on the occupational base of unskilled sedentary work.

> This finding is supported by SSR 85-15, indicating that the basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions, to respond appropriately to supervision, coworkers, and usual work situations; and to deal with
> changes in a routine work setting . . . Here, the claimant still has the mental residual functional capacity to understand, remember and carry out simple, routine and unskilled work and can still interact with the general public, albeit occasionally. These mental restrictions do not meet the guidelines in the above SSR to determine that the claimant is "disabled."

(A.R. 50.) Accordingly, the ALJ concluded that Williamses has not been under a disability as defined in the Social Security Act since the date the application was filed. (A.R. 50.)

## II.  Analysis

Williams contends that the ALJ's decision is incorrect for three reasons: (1) the ALJ improperly evaluated Physician's Assistant LaQuinte's opinion and thus erred in determining Williams's RFC; (2) the ALJ's determination of Williams's credibility is not supported by substantial evidence; and (3) the ALJ improperly relied only on the grids, rather than a vocational expert, in his Step Five determination that jobs exist in significant numbers in the national economy that Williams can perform.

### A.  Residual Functional Capacity Determination

In his decision, the ALJ afforded "some weight" to the opinion of Physician's Assistant LaQuinte. Williams argues that the ALJ erred in rejecting portions of LaQuinte's opinion and that the ALJ did not adequately explain which aspects of LaQuinte's opinion he rejected, and as a result, the ALJ committed legal error in determining Williams's RFC. (Pl.'s Mem. 12-16.) Williams argues that LaQuinte's opinion should have been accorded "controlling weight," as the opinion of a treating physician, and if the ALJ decided not to accord it controlling weight, the ALJ was still required to give it deference and to assess certain factors in deciding how much weigh to accord it. (Pl.s Mem. 13-14.) Williams in particular faults the ALJ for offering no

explanation as to why he disregarded LaQuinte's opinion on Williams's exertional limitations despite finding that opinion to be consistent with his examination findings and the evidence of record. (Pl.'s Reply 2.)

LaQuinte is a physician's assistant, not a treating physician. (A.R. 454; *see also* Def.'s Mem. 17; Pl.'s Reply 2.) The opinion of an "acceptable medical source" is entitled to controlling weight under the so-called "treating physician rule." *Genier v. Astrue,* 298 F. App'x 105, 108 (2d Cir. 2008) (citing 20 C.F.R. § 416.913(a); SSR 06-3p). However, "nurse practitioners and physicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." *Id.* (citing 20 C.F.R. § 416.913(d)(1)). Instead, the ALJ may decide how much weight to give the opinion of a treating physician's assistant, and in doing so, he may consider the factors listed in 20 C.F.R. § 416.927, including:

> (1) whether the source examined the individual, (2) the length and frequency of the treatment relationship, (3) whether the source presents evidence to support an opinion, (4) how consistent the opinion is with the other evidence of record, (5) the specialization of the source and (6) any other relevant factors.

*See Rivera v. Colvin*, No. 13 Civ. 7150 (PGG) (HBP), 2015 WL 1027163, at *15 (S.D.N.Y. Mar. 9, 2015) (citing SSR 06-3p ("Although the factors in 20 CFR §§ 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'")); *Molina v. Colvin*, No. 13 Civ. 4701 (GBD) (GWG), 2014 WL 2573638, at *9 (S.D.N.Y. May 14, 2014), *adopted* 2014 WL 3925303 (S.D.N.Y. Aug. 7, 2014) (Finding that the ALJ was not required to give controlling weight to a physical therapist's opinion, and "[r]ather, the ALJ has discretion to determine the appropriate weight to accord to a physical therapist's opinion based on all the evidence before the ALJ." (citation and internal quotation marks omitted)).

17

Though the opinion is not entitled controlling weight, "[s]ources not technically deemed 'acceptable medical sources' . . . are important in the medical evaluation because they 'have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.'" *Phelps v. Colvin*, No. 12 Civ. 976S, 2014 WL 122189, at *3 (W.D.N.Y. Jan. 13, 2014) (quoting SSR 06-3p). This is particularly so where the physician's assistant had "a lengthy treatment relationship" with the claimant. *Rivera*, 2015 WL 1027163, at *15; *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983) ("Inasmuch as Nurse [Practitioner] Laro did treat [claimant] on a regular basis, her opinion is entitled to some extra consideration, but the diagnosis of a nurse practitioner should not be given the extra weight accorded a treating physician."); *Daniels v. Colvin*, No. 14 Civ. 02354 SN, 2015 WL 1000112, at *14 (S.D.N.Y. Mar. 5, 2015) ("Although the opinions of a nurse practitioner with a longitudinal treatment history with a claimant are due some weight, they are not due the controlling weight that a treating physician's opinions garner.").

Here, the ALJ mistakenly treated Physician's Assistant LaQuinte as a treating physician, but ultimately determined that his opinion was not due controlling weight. (*See* A.R. 44 ("Dr. LaQuinte is a treating source who has seen the claimant on more than one occasion.")) The ALJ properly considered LaQuinte's treatment notes and opinion and properly decided to give it only "some weight." As the ALJ explained, LaQuinte had personally examined Williams and had seen the claimant on more than one occasion, and his opinions on Williams's exertional limitations were consistent with his notes and the record as a whole—factors that weigh in favor of his opinion, under 20 C.F.R. § 416.927. However, the ALJ noted three specific parts of LaQuinte's opinion unsupported by his treatment notes: first, LaQuinte's opinion that Williams would need an hourlong break every half hour (the so-called "Accommodation"), that Williams

18

would need to miss more than three days of work a month, and that Williams had manipulative limitations.[3] As described above, LaQuinte's treatment notes reflect that he found Williams to have a full range of motion in her extremities, and he seemed to believe her condition was improving, as he did not refill her Percocet prescription. Based on all of the evidence before him, including the inconsistencies between the listed limitations and LaQuinte's treatment record, the ALJ determined the appropriate weight to give LaQuinte, as an "other source." *See Molina*, 2014 WL 2573638, at *9. His decision did not constitute legal error; therefore, the RFC determination was properly made.

### B.      Credibility Determination

In determining Williams's RFC, the ALJ considered Williams's own credibility and "[did] not find the claimant's statements to be fully credible." (A.R. 48.) Williams argues that this determination was erroneous. (Pl.'s Mem. 16-17.)

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account," *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 416.929), "but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. *Id.* (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). To evaluate a claimant's assertions of pain and other limitations, the ALJ must follow a two-step process: "at the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce

---

[3] Williams argues that the ALJ's decision is unclear in terms of which of LaQuinte's opinions it rejects, as the decision states, "[T]here is nothing in the record or in [LaQuinte's] notes to demonstrate that the claimant would need the accommodations that he prescribed . . ." From looking at the medical source statement, however, it is clear that the ALJ is referring to LaQuinte's opinion that Williams needs an hour-long break every half hour, as this is the only item in the "Accommodations" section of the statement.

19

the symptoms alleged," then, "[i]f the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (citing 20 C.F.R. § 404.1529(a)) (internal citation, quotation marks and alterations omitted). In particular, "[t]he ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings." *Id.* (citations and internal quotation marks omitted); *see also* 20 C.F.R. § 416.929(c); SSR 96-7p.

"It is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (quoting *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)) (alteration omitted). "[A]n ALJ's credibility determination is generally entitled to deference on appeal," *Selian v*, 708 F.3d at 420, and "where the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, [the reviewing courts] must defer to his findings." *Calabrese*, 358 F. App'x at 277.

Here, the ALJ applied the two-step framework and found that Williams's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's testimony concerning the intensity, persistence and limiting effects of these symptoms do not support a finding of disability." (A.R. 48.) In making this decision, the ALJ relied on the factors described in 20 CFR § 416.929(c) and SSR 96-7p. (A.R. 48-49.) The ALJ found that Williams's "testimony does not comport with her reported activities of daily

living," noting various discrepancies between the more severe limitations Williams testified to and the lesser limitations she reported to her consultative examiners. (A.R. 48.) The ALJ concluded that "although these reports [to the consultative examiners] came before her testimony, the longitudinal medical record does not demonstrate a significant worsening of the claimant's condition. For this reason, the undersigned does not find the claimant's statements to be fully credible." (A.R. 48.) However, Williams argues that the ALJ's assessment of her daily activities was flawed, because it considered only the limitations she reported to the consultative examiners and not the limitations she reported to other examiners and in her self-reported adult function report. (Pl.'s Mem. 17-18.)

The Court finds that the ALJ's credibility determination is supported by substantial evidence and that the ALJ properly considered Williams's daily activities. First, despite Williams's contention, the ALJ specifically referred to Williams's self-reported adult function report in his discussion of why her testimony was *not* credible; while he noted the various limitations she reported there, he also noted that those reported limitations conflicted with those that she reported to the consultative experts.[4] (A.R. 48.) While it is true that her adult function report reflects severe limitations on daily activities, it would be circular to find that the report weighs in favor of her credibility, as it is the very content of the report that the ALJ found to be contradicted by the medical record. Second, the parts of the medical record that Williams argues the ALJ overlooked do not, in fact, contradict the parts of the medical record that the ALJ relied upon. Williams points to her statements to Dr. Broska that she "does not have any clothes . . . likes to stay home . . . sometimes she feels like she does not want to shower[,] [s]he just wants to

---

[4] The ALJ wrote, "In her adult functioning report, she stated that a herniated disk in the back prevents her from lifting, and she cannot stand because of her back and foot pain . . . However, the medical record shows that the claimant can still perform activities of daily living." (A.R. 48.)

stay in bed and watch TV . . . [and] [s]he does not like to take the train or bus because it triggers anxiety." (A.R. 367-68.) She argues that these statements contradict the statements to Dr. Mescon, on which the ALJ relied, that she "can cook, clean, do the laundry, and dress. The claimant spends her time watching TV and performing household chores." (A.R. 363.) However, the ALJ did not see any conflict between these statements, and nor does the Court: her statements to Dr. Broska reflected Williams's preferences, rather than her abilities or her actual day-to-day habits. Thus, Williams's statements to Dr. Broska contradict her own testimony that she is *not able* to perform activities of daily living.

"Where an ALJ decides to discount a claimant's subjective allegations of pain, the reviewing court must defer to that credibility assessment, as long as the ALJ's findings are explained and supported by substantial evidence." *McDonaugh v. Astrue*, 672 F. Supp. 2d 542, 565 (S.D.N.Y. 2009). Here, the ALJ's determination on credibility is supported by the substantial record evidence and is adequately explained. Thus, the Court must defer to it.

### C.    Step Five Determination

Finally, Williams argues that the ALJ erred in making his determination at Step Five of the framework that she had the RFC to perform alternative substantial gainful work in the national economy, as the ALJ did not rely on a vocational expert to come to that decision.

At Step Five, the ALJ has the burden of proving that the claimant has "a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Roma v. Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)). Though the ALJ may ordinarily meet this burden by relying on the applicable medical vocational guidelines, "sole reliance on the guidelines may be inappropriate where the claimant's exertional impairments are compounded by nonexertional

impairments." *Id.* The presence of nonexertional impairments alone does not require the testimony of a vocational expert; instead, such testimony is required only when "a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'" *Bapp*, 802 F.2d at 605 (quoting *Blacknall v. Heckler*, 721 F.2d 1179, 1181 (9th Cir. 1983)). "A nonexertional impairment significantly limits a claimant's range of work when it causes an additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Doria v. Colvin*, No. 14 Civ. 7476 (KPF), 2015 WL 5567047, at *10 (S.D.N.Y. Sept. 22, 2015) (quoting *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2011)) (internal quotation marks and alterations omitted).

Here, the ALJ found that Williams had non-exertional limits. He found that she had the RFC to perform "sedentary work as defined in 20 CFR 416.967(a) except the claimant is limited to simple, routine and repetitive tasks performed in a low stress environment, defined as involving only occasional interaction with others." But he also found that the "additional limitations have little or no effect on the occupational base of unskilled sedentary work," and noted that under SSR 85-15, "the basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; [and] to respond appropriately to supervision, coworkers, and usual work situations . . ." (A.R. 50 (quoting SSR 85-15)).

According to SSR 85-15:

A substantial loss of ability to meet *any* of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15. The limitations identified by the ALJ here—William's inability to interact with "others" on a more than occasional basis—could reasonably be expected to cause an additional loss of work capacity beyond a negligible one, *see Zabala*, 595 F.3d at 411, as they could limit her ability to take instruction, and to respond appropriately to supervision, coworkers, and usual work situations. Indeed, "[t]he SSA's rulings explicitly recognize this, indicating that an inability to interact with co-workers would in and of itself be grounds for a finding of disability." *Doria*, 2015 WL 5567047, at *10 (citing SSR 85-15).

The limitations identified could "significantly limit the range of work permitted by [Williams's] exertional limitations," *Bapp* 802 F.2d at 605, and so the ALJ was required to consult a vocational expert. *See Doria*, 2015 WL 5567047, at *10 (remanding for consideration of vocational expert testimony where claimant was limited to "only occasional interaction with coworkers and no interaction with the public"); *Ketch v. Colvin*, No. 12 Civ. 1104, 2014 WL 411875, at *3 (W.D.N.Y. Feb. 3, 2014) ("[T]he nonexertional limitations set forth by the ALJ, including the need to work under remote or indirect supervision and the inability to interact with co-workers on more than an occasional basis, are significantly limiting . . . As such, reliance on the grids was inappropriate . . ."); *Provost v. Astrue*, No. 08-CV-1133 VEB, 2011 WL 12472551, at *9 (N.D.N.Y. Mar. 31, 2011) (Finding that "consultation of a vocational expert would appear to be warranted," as "the ALJ's own finding that Plaintiff was limited to a low stress work environment involving only occasional interaction with co-workers, is indicative of a substantial loss of ability to meet a basic work-related activity.")

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is reversed and remanded for rehearing; Plaintiff's motion for judgment on the pleadings is GRANTED to the extent that it

requests a remand for rehearing; and Defendant's motion for judgment on the pleadings is DENIED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

**SO ORDERED.**

**Dated**:   May 26, 2016
           New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**